IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARCO ANTONIO GARCIA-MEDINA,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:11-CR-545-TC |

Defendant Marco Antonio Garcia-Medina filed a motion to suppress evidence obtained by the Utah Highway Patrol in connection with a June 4, 2011 stop and search of the car Mr. Garcia-Medina was driving. Although Mr. Garcia-Medina does not challenge the stop itself, he contends that the officer did not have any basis for searching the car during the traffic stop. He seeks suppression of all evidence and statements obtained during the search of the car and as fruit of the poisonous tree.

The court finds that (a) the Government waived its right to contest Mr. Garcia-Medina's assertion that he has standing to challenge the search; (b) the officer did not have a legally or factually valid reason to impound the car; (c) the officer's purported inventory search of the car on the side of the highway was a pretext to search for illegal drugs; and (d) the officer lacked probable cause to search the car. Accordingly, the motion to suppress is GRANTED.

# FINDINGS OF FACT[1]

## The Stop and Search

Around 7:00 a.m. on June 4, 2011, along I-15 at mile marker 219 (near Nephi, Utah), Utah Highway Patrol Trooper John Sheets stopped a Jeep Grand Cherokee SUV driven by Mr. Garcia-Medina (no one else was in the car). The traffic stop was recorded by a video camera in Trooper Sheets's patrol car and a microphone on Trooper Sheets's uniform. (See Video Recording of June 4, 2011 Traffic Stop (Def.'s Ex. A) ["Traffic Stop Video"].)

Trooper Sheets stopped the car because he suspected that the car's front window tint was darker than allowed by Utah law. Trooper Sheets measured the tint of the front-seat passenger-side window and confirmed his suspicion. He then asked Mr. Garcia-Medina for a driver's license, proof of insurance, and registration information. As soon as Trooper Sheets interacted with Mr. Garcia-Medina, is was apparent to him that Mr. Garcia-Medina does not speak or understand English very well. Trooper Sheets knows a limited amount of Spanish.

Mr. Garcia-Medina provided a Mexican driver's license, as well as insurance and car registration papers. The insurance and registration information showed that the car belonged to someone other than Mr. Garcia-Medina. According to the papers, the owner of the car lived in West Valley City, Utah, which is approximately 85 miles from where the traffic stop occurred. When Trooper Sheets asked Mr. Garcia-Medina where he lived, the Defendant responded "Arizona." Trooper Sheets asked Mr. Garcia-Medina how long he had lived in Arizona; Mr.

---

[1] The facts are taken from the testimony, video tape of the traffic stop, and other evidence admitted during the March 29, 2012 evidentiary hearing on Mr. Garcia-Medina's motion to suppress and the final argument on May 23, 2012.

Garcia-Medina replied "one year." Trooper Sheets asked him whether the car was his and he said "no."

Trooper Sheets went back to his patrol car and asked dispatch to determine whether Mr. Garcia-Medina had a driver's license in Utah or Arizona. The dispatch operator said she could not find a record of a Utah or Arizona license issued to Mr. Garcia-Medina but confirmed that the car's license plate, insurance and registration information were current and valid.

As soon as Trooper Sheets heard that Mr. Garcia-Medina did not have a Utah or Arizona driver's license, he requested a tow truck to impound the car on the basis that the driver had no valid driver's license. He testified that he believed the Mexican driver's license was counterfeit. But Trooper Sheets was vague in his testimony, stating that when he first saw the Mexican license, he believed it "had some qualities that appeared to be counterfeit[.]"[2] (Tr. of Mar. 29, 2012 Evid. Hr'g (Docket No. 31) [hereinafter "Tr."] at 7.)

Trooper Sheets testified that while he was in his patrol car waiting for the dispatch operator to respond, he scanned Mr. Garcia-Medina's Mexican license with a black light which reveals a 3-D effect in the hologram, which, according to Trooper Sheets, indicates a valid document. Trooper Sheets claims that the lack of a 3-D effect was sufficient evidence that the Mr. Garcia-Medina's driver's license was counterfeit.

Trooper Sheets has some training in the detection of fraudulent driver's licenses, but his training was limited. It lasted only a couple of days, was conducted by Utah authorities, and focused mainly on licenses issued in the United States, with only a brief discussion about

---

[2]The dispatch operator does not have a way to check whether a Mexican driver's license is valid.

Mexican and Canadian licenses. (See Tr. at 20, 23.) Defense counsel pointed out (and Trooper Sheets conceded) that Trooper Sheets did not know whether every state in Mexico issued a driver's license with a hologram that reveals a 3-D effect under black light. Here, Trooper Sheets assumed, because Mr. Garcia-Medina's hologram did not reveal a 3-D hologram under black light, that the driver's license was counterfeit.

Trooper Sheets did not explore his suspicions about the license with Mr. Garcia-Medina. He did not ask Mr. Garcia-Medina any questions about the registered owner, nor did he try to reach the registered owner. (Tr. at 56-57.) Trooper Sheets did not ask Mr. Garcia-Medina where he had come from or where he was going.

About a minute and a half after requesting a tow truck, with no further questioning of Mr. Garcia-Medina and no further inquiries of the dispatch operator, Trooper Sheets requested a drug-sniffing dog (indeed the request was made less than a minute after the dispatch operator confirmed that a tow truck had been called). (See Traffic Stop Video at 07:19:26 to 07:19:50 (Trooper Sheets and then dispatch operator requesting tow truck) and 07:20:41 to 07:20:57 (Trooper Sheets and then dispatch operator requesting drug-sniffing dog).)

After Trooper Sheets called for a tow truck and a dog, he left his patrol car and ordered Mr. Garcia-Medina out of the car. He checked Mr. Garcia-Medina for weapons and told him to stand off to the side of the road, away from the car. Without giving any explanation to Mr. Garcia-Medina, and without asking permission to search the car, Trooper Sheets opened the passenger-side front door and began searching the car.

At the end of the initial search, when Trooper Sheets opened the suitcase, he soon found a small plastic bag filled with what he believed to be methamphetamine. At that point, Trooper

4

Sheets went over to Mr. Garcia-Medina, said "drogas" (the Spanish word for drugs), and handcuffed him.

After Trooper Sheets found the small bag of apparent methamphetamine in the suitcase, he arrested Mr. Garcia-Medina. The car was then taken to the impound lot, where a more thorough search revealed a larger amount of methamphetamine hidden in the bumper area of the car.

**<u>Justification for the Search</u>**

According to Trooper Sheets, he began an inventory search because he was impounding the car for lack of a licensed driver. As Trooper Sheets admitted during the evidentiary hearing, an inventory search is supposed to be as thorough and accurate as possible, and he is required to make a written list of each item he finds during the search:

> Q      So an inventory search, Trooper, should look different than just the general rummaging through the car for items; right?
>
> A      Yes.
>
> Q      You're going to be methodically looking at things and writing them down?
>
> A      Yes.
>
> Q      Taking your time?
>
> A      Yes.
>
> Q      To be accurate and thorough?
>
> A      Yes.

(Tr. at 51-52.)

Based on the record before the court, Trooper Sheets's explanation for the search (i.e.,

impound of the car based on no licensed driver) is not persuasive. Both the Traffic Stop Video and the Incident Report expose problems with his testimony.[3]

The search depicted in the Traffic Stop Video does not resemble an inventory search. Trooper Sheets began searching the front passenger area, where, according to Mr. Garcia-Medina, Trooper Sheets was tapping on the center plastic console looking for a hidden compartment. When questioned during cross-examination, Trooper Sheets admitted "that on the microphone [he] had on [his] chest there's some banging going on, tapping, hard plastic being tapped[.]" (Tr. at 53.) After looking through the front passenger seat, he briefly searched the backseat and then the back compartment of the SUV, where he opened a suitcase, quickly checking the contents of the suitcase's smaller compartments. During the search of the car, Trooper Sheets did not have a pen in his hand, did not write anything down, and appeared to be rummaging through the car.

Inconsistencies between Trooper Sheets's testimony and his Incident Report also raise concerns for the court. Trooper Sheets wrote his Incident Report later in the day after the initial search and subsequent arrest of Mr. Garcia-Medina had occurred. His narrative included, in pertinent part, the following:

> 1) . . . The driver provided me with the registration, insurance, and a counterfeit Mexican driver's license. I later determined the license was counterfeit, because the [holograms] did not glow under the black light. . . .
>
> 2) . . . The driver stated he had lived in Arizona for over a year, so he should have

---

[3]During the evidentiary hearing, even Trooper Sheets seemed uncertain about the reason for impounding and searching the car. (See Def.'s Mem. in Supp. Mot. Suppress (Docket No. 33) at 8-9 n.8 (articulating how Trooper Sheets changed his testimony during the evidentiary hearing, giving different reasons for impounding the car).)

had an Arizona driver's license. A check revealed the driver did not have a valid driver's license.

3) While I was talking with the driver, I became suspicious of possible criminal activity. I had observed air fresheners stuck in every air vent. **[This information was not presented by the Government during Trooper Sheets's testimony or in subsequent briefs.[4]]** The driver was coming from Phoenix and was headed to Salt Lake. Phoenix is a well known drug distribution area. **[These two sentences set forth information that Trooper Sheets learned <u>after</u> the search and arrest of Mr. Garcia-Medina. The information could not have influenced Trooper Sheets's decision to search the car.]** The vehicle was registered to a third party in Utah, while the driver stated he had lived in Arizona.

4) I decided to impound the vehicle due to no licensed driver. I conducted an inventory of the vehicle. . . . .

(Trooper Sheets's Incident Report (Def.'s Ex. E) [hereinafter "Incident Report"] at 000003.)

On direct examination, Trooper Sheets testified that he checked the license's hologram before he searched the car. But in the Incident Report, Trooper Sheets wrote that he "<u>later</u> determined the license was counterfeit, because the pantagrams [sic – should be "holograms"] did not glow under the black light." (Id. (emphasis added).) Mr. Garcia-Medina raises this discrepancy as evidence that, at best, Trooper Sheets's memory was unreliable so many months after the stop, that he did not in fact check for a glowing hologram during the stop but did so after the stop had concluded, and that he did not have any basis during the stop for determining that the driver's license provided by Mr. Garcia-Medina was invalid. The video does not reveal what Trooper Sheets was doing in his patrol car while waiting for the dispatch operator to respond to his questions, but Trooper Sheets's use of the word "later" raises some concerns in the court's

---

[4]He did not mention the air fresheners during his testimony, and the Government did not reveal that information in its briefs or during oral argument. The court only learned that information by chance after the court requested a copy of Trooper Sheets's Incident Report during final argument to confirm events relating to the black light test.

mind.

More concerning is that the report combines information obtained at different times throughout Trooper Sheets's encounter with Mr. Garcia-Medina, including information gathered <u>after</u> Trooper Sheets conducted the initial search of the car (for example, apparent statements made by Mr. Garcia-Medina after being arrested). A fair amount of the information presented in the report could not have provided probable cause to search the car because it was not information Trooper Sheets had at the time of the road-side search. (Compare Incident Report (Def.'s Ex. E) (containing information learned <u>after</u> the search and arrest of Mr. Garcia-Medina, including that he was traveling from Phoenix, a "well known drug distribution area") to Traffic Stop Video (Def.'s Ex. A) (in which Trooper Sheets did not ask follow-up or exploratory questions and so the statements made by Mr. Garcia-Medina were limited to the fact that he had lived in Arizona for about a year and that he had borrowed the car from a friend).) If, as the report suggests, Trooper Sheets was "suspicious" of drug activity, he never followed up with Mr. Garcia-Medina about his suspicions. Instead, he immediately decided to impound the car "due to no licensed driver." (<u>Id.</u>)

The record as a whole casts doubt on the Government's basis for justifying the search.

## CONCLUSIONS OF LAW

Mr. Garcia-Medina requests that the court suppress all of the drug evidence obtained by the police because it was fruit of an illegal search and seizure.

**Standing**

Mr. Garcia-Medina, in his February 27, 2012 Motion to Suppress, asserted that he had standing to challenge the search "because he was the driver and sole occupant of the vehicle that

was the subject of the stop and search." (Mot. Suppress (Docket No. 28) at 1.) The court held an evidentiary hearing on March 29, 2012. Mr. Garcia-Medina filed his supporting memorandum on April 25, 2012. On May 8, 2012, the Government indicated <u>for the first time</u> to Mr. Garcia-Medina and the court that it would challenge Mr. Garcia-Medina's standing assertion. (<u>See</u> U.S.'s Opp'n Mem. (Docket No. 34) at 3-5.)

During the final argument on May 23, 2012, the court asked the Government why it had not given Mr. Garcia-Medina any notice, before the evidentiary hearing, that it would challenge his standing assertion. The Government provided no explanation, simply pointing out that a defendant asserting standing must present evidence of such at the evidentiary hearing or he has not met his burden. Had the Government timely notified Mr. Garcia-Medina that it challenged his assertion, he would have had notice that the issue was being disputed and that he would have to present evidence during the hearing. The Government's failure to do so before the evidentiary hearing unfairly prejudiced Mr. Garcia-Medina.

Because the Government did not dispute standing in a timely fashion, the Government has waived its right to challenge standing. <u>See</u> <u>United States v. Olivares-Rangel</u>, 458 F.3d 1104, 1106 n.1 (10th Cir. 2006) (finding that Government waived the non-jurisdictional issue of standing by failing to argue the issue); <u>United States v. Dewitt</u>, 946 F.2d 1497, 1499-1500 (10th Cir. 1991) (holding that "the issue of fourth amendment standing could be waived if the government has 'failed to raise it in a timely fashion during the litigation'") (quoting <u>Steagald v. United States</u>, 451 U.S. 204, 209 (1981)); <u>United States v. Foster</u>, 763 F. Supp. 2d 1086, 1087-88 (D. Minn. 2011) (same).

9

**No Legal or Factual Basis to Search the Car**

    **Inventory Search**

"An inventory search conducted as part of regular procedures [for example, in connection with impounding a car], and for administrative rather than investigatory purposes, does not require a warrant." United States v. Edwards, 632 F.3d 633, 644 (10th Cir. 2001). The Government contends that Trooper Sheets conducted a valid inventory search of the car because the car was about to be impounded for no licensed driver.

But Trooper Sheets had no legitimate basis for concluding that the Mexican license was invalid and so he had no basis for impounding the car. He was not an expert on Mexican driver's licenses. He had approximately two days of training on the validity of driver's licenses in general, and that training focused on licenses issued by states in the United States of America with a smattering amount of information on Canadian and Mexican licenses. He also admitted that he had no way of knowing whether states within Mexico vary in their rules about holograms on licenses. Apart from the black light test (and the record is not clear whether the test was conducted before or after the search), Trooper Sheets did not articulate a specific reason why he believed the license was counterfeit. After he determined that the license plate, insurance, and registration were valid, he had no legitimate basis to detain Mr. Garcia-Medina or impound the car, much less to search the car. The Government does not cite to any law in Utah that prohibits a person from driving a car in the State of Utah with only a valid Mexican driver's license.[5]

---

[5]The Government claims that impounding the car was justified because Arizona law requires an Arizona resident to have an Arizona license, which Mr. Garcia-Medina clearly did not have. But Trooper Sheets did not ask Mr. Garcia-Medina whether he had lived continuously in Arizona, and there is no evidence that Arizona law was violated. More importantly, Mr.

Even if there was some basis for impounding the car, the video shows that Trooper Sheets was not conducting a valid inventory search. "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987). Inventory searches "'are reasonable only if conducted according to standardized procedures.'" United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003) (quoting United States v. Haro-Salcedo, 107 F.3d 769, 772 (10th Cir. 1997).) Trooper Sheets did not follow standardized inventory procedures when he searched the car.

It is well-established that an inventory search may not be used as a ruse for a general search. Florida v. Wells, 495 U.S. 1, 4 (1990) ("Our view that standardized criteria or established routine must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.") (internal citations omitted). See also United States v. Edwards, 632 F.3d 633, 644 (10th Cir. 2001) ("To be justified as an inventory search, . . . the search cannot be investigatory in nature but must instead be used only as a tool to record the defendant's belongings to protect the police from potential liability.").

Here, Trooper Sheets did not write anything down. He was not methodical in his search. He was tapping and rummaging, looking for something hidden. He called for a drug-sniffing dog

---

Garcia-Medina was stopped in Utah. As the Defendant notes, "[t]he fact that Mr. Garcia-Medina claims to have lived in Arizona for one year did not, without more, invalidate his Mexican license in Utah. Even if the Government could prove how long Mr. Garcia-Medina had continuously lived in Arizona, it cannot prove that Mr. Garcia-Medina's Mexican license was invalid in the State of Utah based on an Arizona residency statute." (Def.'s Reply (Docket No. 35) at 4.)

without any basis for suspecting that drugs were present. And he made that request almost immediately after he requested the tow truck, even though at that point in the stop he had not asked Mr. Garcia-Medina questions to dispel his concerns about the driver's license, Mr. Garcia-Medina's residency in Arizona, or anything else of substance. The court finds that the purported inventory search was a pretext for investigating criminal activity and so it violated Mr. Garcia-Medina's Fourth Amendment rights.

**Safety Justification**

Alternatively, the Government claims that Trooper Sheets's initial search was a "cursory examination to determine if there [were] weapons or other hazardous items present" because he was in a "perilous situation." (U.S.'s Mem. Opp'n Mot. Suppress (Docket No. 34) at 8.) But as the Defendant notes, "[t]he circumstances were hardly perilous. The stop occurred in broad daylight on a public highway. The highway was alive with traffic, thus, the trooper was not in an isolated environment. Additionally, the trooper had already searched Mr. Garcia-Medina and determined that he did not have any weapons." (Def.'s Reply (Docket No. 35) at 7 n.4.) And Trooper Sheets's demeanor on the video, in light of Mr. Garcia-Medina's passivity and compliance, strongly suggests that Trooper Sheets did not view himself to be in a "perilous situation." Under the circumstances, the Government's argument is not persuasive.

**No valid exception to the warrant requirement**

Under the automobile exception to the warrant requirement, a police officer may search a car during a traffic stop if the officer has probable cause to believe the car contains contraband. Edwards, 632 F.3d at 644-45. "Probable cause to search a vehicle is established if, under the 'totality of the circumstances' there is a 'fair probability' that the car contains contraband or

12

evidence." United States v. Nielsen, 9 F.3d 1487, 1489-90 (10th Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

As discussed above, Trooper Sheets did not have reasonable suspicion, much less probable cause, to believe drugs were in the car at the time he initiated the search. And, based on footage from the video, it appears that he initiated the search based on a hunch. Later in the stop, after Mr. Garcia-Medina was handcuffed and they were waiting for the tow truck and drug-sniffing dog to arrive, Trooper Sheets made a telling statement to responding officers. In response to their question about the quantity of drugs he had found, he said "just personal use so far." And then he said, "I've got some vibes that there's more in there, so I've got a dog coming." (Traffic Stop Video at 7:44:54 to 7:45:41.) The dog he mentions is the one he requested early in the stop before he began the purported inventory search. Although his statements are not directly pertinent because they occurred after the events at issue, they nevertheless lend support to the court's conclusion that the inventory search was a pretext.

## ORDER

For all of the foregoing reasons, the search of Mr. Garcia-Medina's car was an unreasonable search in violation of the Fourth Amendment. Accordingly, Defendant Marco Antonio Garcia-Medina's Motion to Suppress (Docket No. 28) is GRANTED.

DATED this 8th day of June, 2012.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge